2000 SD 30

**Scott DAVI, Petitioner and Appellant,**

v.

**Joseph CLASS, Warden, South Dakota State Penitentiary, Appellee.**

No. 19844.

Supreme Court of South Dakota.

Considered on Briefs Oct. 20, 1999.

Decided March 1, 2000.

Cynthia A. Howard, Public Advocate, Sioux Falls, for petitioner and appellant.

Mark Barnett, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, for appellee.

GORS, Circuit Judge.

[¶ 1.] Scott Davi is serving a life term for murder. He applied for a writ of habeas corpus alleging ineffective assistance of counsel. The habeas corpus court denied relief and Davi appealed. During the pendency of this appeal Davi requested additional DNA testing. We remanded to the habeas corpus court for further proceedings which are now complete. We affirm.

## PROCEDURAL HISTORY

[¶ 2.] On November 2, 1990, Davi's ex-wife Diane Davi was brutally beaten, raped and murdered in her home in Sioux Falls. Davi was convicted by a Minnehaha County jury of two counts of first degree murder, three counts of first degree burglary and one count of first degree rape. He was sentenced to concurrent life terms and concurrent fifteen and twenty year sentences. He was also found to be a habitual offender. Davi appealed and this Court affirmed, *State v. Davi,* 504 N.W.2d 844 (S.D.1993), with the directive to vacate one of the sentences for first degree murder in light of *Wilcox v. Leapley,* 488 N.W.2d 654 (S.D.1992).

[¶ 3.] Davi filed an application for a writ of habeas corpus on August 9, 1995. The habeas corpus court held four hearings and ordered resentencing on two burglary counts for double jeopardy reasons. This relief was not opposed by the State and is not at issue here.

[¶ 4.] On December 30, 1997, while this appeal was pending, Davi requested new DNA testing. On April 15, 1998, we remanded this matter to the habeas corpus court for new DNA testing. When the testing was completed, the habeas corpus court admitted the new DNA evidence over Davi's objection.

## FACTS

[¶ 5.] Diane Davi was discovered in her bedroom on November 2, 1990, naked, with blood stained underpants forced into her mouth as a gag, and a douche bottle wrapped in a washcloth in her vagina. She had been beaten, raped and strangled with heavy-gauge knitting yarn tied in a slip knot.

[¶ 6.] After a turbulent marital and post-divorce relationship, Diane completely severed her involvement with Davi in early October 1990 because she learned that his current girlfriend was pregnant. On October 22, 1990, eleven days before her death, Diane obtained a protection order which was served on Davi. A hearing was scheduled for November 5, 1990, to review the protection order. Davi retaliated against Diane by trying to obtain a protection order against her from another judge. When the other judge refused, Davi said "I'll just have to take care of this myself."

[¶ 7.] Despite the protection order, Davi continued to stalk Diane. On October 29, 1990, at approximately 4 a.m., he cornered her in a parking lot at work, gave her a music box and pleaded with her not to send him back to prison. The next day, Davi told a friend of Diane's that he wasn't going to give up and that he was going to have Diane. He also told a friend of his

from prison that "I'll never give up" and that he did not want "to let Diane go." The crime scene investigation revealed a vibrator and a diamond ring that Davi gave Diane were missing from her home.

[¶ 8.] At trial, Davi's defense was an alibi and he proposed Dale Callies, Diane's previous ex-husband, as a third party perpetrator. A semen stain on Diane's leg was tested. Both Davi and Callies were included in the twenty percent of the male population that the State's serology expert said could have deposited the semen. Callies had no alibi.

## HABEAS FACTS

[¶ 9.] Davi's family retained three attorneys to represent him during his trial: Michael Colich, Peter Cahill and Steven R. Binger. All three defense attorneys testified at the habeas trial.

[¶ 10.] At the time of trial, Michael Colich of Minneapolis, Minnesota, was licensed in Minnesota, a member of the federal bar and admitted to practice before the United States Supreme Court. His entire twenty-year practice had been in criminal law with over seven years as a prosecutor for the Hennepin County Attorney's Office and the rest as a defense attorney. Colich had been involved in twenty-five to thirty-five homicide cases. He had lectured at numerous continuing legal education functions and at the annual Minneapolis Criminal Justice Institute for twenty years. In 1991 or 1992, he was named one of the twenty top trial lawyers in Minnesota. In 1993, a poll of Minnesota judges rated him among the top fifteen lawyers in the categories of most courteous, most well-prepared, and "winningest" attorney.

[¶ 11.] Colich's partner, Peter A. Cahill, Wayzata, Minnesota, was licensed in Minnesota in 1984. He worked in the Hennepin County Attorney's office under the student practice rule and, at the time of trial, practiced solely criminal defense. He had worked on approximately ten homicide cases at the time of the Davi trial

and had expertise in defending violent crimes and homicides.

[¶ 12.] Steve Binger was local counsel. Although he had only practiced criminal defense since 1989, he had served as a deputy Minnehaha County State's Attorney for ten years. He attended the trial and participated in preparation and strategy, but did not question or cross examine witnesses or make argument at the trial.

[¶ 13.] Davi complains that defense counsel were ineffective for several reasons.

## REMAND FACTS

[¶ 14.] As noted earlier, during the investigation, a semen stain was found on Diane Davi's leg. Scientific testing revealed the stain could have been deposited by any of twenty percent of the male population. Davi was included in the twenty percent. Narrower Deoxyribonucleic Acid (DNA) testing could not be done because at the time of Davi's trial, Restriction Fragment Length Polymorphism (RFLP) DNA testing required more material than was available. Subsequent development of Polymerase Chain Reaction (PCR) DNA testing made accurate testing of small samples possible. Upon remand, the PCR testing excluded Dale Callies, Davi's proposed third party assailant, but not Davi. Statistical probability analysis further revealed that there was only a one in one million chance that a male Caucasian other than Davi left the sample. Although Davi objected, the habeas corpus court admitted the results which exonerated Callies and incriminated Davi. Davi now asserts that the habeas corpus court should not have admitted this new factual evidence.

## STANDARD OF REVIEW

[¶ 15.] Habeas corpus collaterally attacks a final judgment and is not a substitute for direct review. *O'Connor v. Leapley*, 488 N.W.2d 421 (S.D.1992). Habeas corpus only reviews jurisdiction, lawfulness of a sentence and whether an in-

carcerated defendant has been deprived of basic constitutional rights. *Goodroad v. Solem*, 406 N.W.2d 141 (S.D.1987). Ordinarily, the habeas corpus court's findings of fact and conclusions of law may not be overturned unless they are clearly erroneous. SDCL 15–6–52(a); *Satter v. Solem*, 422 N.W.2d 425 (S.D.1988); *Cowell v. Leapley*, 458 N.W.2d 514 (S.D.1990). However, ineffective assistance of counsel is a mixed question of fact and law on which this Court can substitute its own judgment as to whether counsel's representation was ineffective. *Sprik v. Class*, 1997 SD 134, 572 N.W.2d 824; *St. Cloud v. Leapley*, 521 N.W.2d 118 (S.D.1994); *Aliberti v. Solem*, 428 N.W.2d 638 (S.D.1988); *Lykken v. Class*, 1997 SD 29, 561 N.W.2d 302.

## INEFFECTIVE ASSISTANCE OF COUNSEL

[¶ 16.] The two-part test from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is used to determine whether there has been ineffective assistance of counsel. First, did trial counsel make such serious errors that counsel was not functioning as counsel guaranteed by the Constitution? Second, did the errors prejudice the defendant so that the defendant did not receive a fair trial? *Fast Horse v. Leapley*, 521 N.W.2d 102 (S.D.1994).

[¶ 17.] Effective counsel is not always equated with a successful result. *Jenner v. Leapley*, 521 N.W.2d 422 (S.D. 1994). Attorneys are presumed to be competent until shown otherwise and a petitioner claiming ineffective assistance of counsel carries a heavy burden. *Lykken*, 1997 SD 29 at ¶ 20, 561 N.W.2d at 307. The reasonableness of counsel's performance is evaluated from counsel's perspective at the time in light of all of the circumstances. *Phyle v. Leapley*, 491 N.W.2d 429 (S.D.1992). This Court will not second-guess experienced counsel regarding trial tactics or strategy. *Fast Horse*, 521 N.W.2d at 106. Counsel must

investigate and consider possible defenses and make reasonable decisions. *Application of Deserly*, 507 N.W.2d 905 (S.D. 1993). A difference in tactics and strategy is not ineffective assistance of counsel. *Fast Horse*, 521 N.W.2d at 106.

## NEW EVIDENCE

[¶ 18.] In *Black v. Class*, 1997 SD 22, 560 N.W.2d 544, this Court held that a habeas corpus court's decision to admit evidence is reviewed under an abuse of discretion standard. "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *State v. Henry*, 1996 SD 108 ¶ 10, 554 N.W.2d 472, 473. "Under this standard, 'not only must error be demonstrated, but it must also be shown to be prejudicial error.'" *State v. Spiry*, 1996 SD 14 ¶ 11, 543 N.W.2d 260, 263 (quoting *Shaffer v. Honeywell, Inc.*, 249 N.W.2d 251, 258). The trial court's evidentiary rulings are presumed to be correct. *State v. White*, 1996 SD 67, 549 N.W.2d 676.

## ISSUE ONE

## NEW DNA EVIDENCE

[¶ 19.] As someone once observed, "You have to be careful what you wish for because you might get it." In this case, Davi wished for DNA testing to prove he was innocent. Instead, the testing not only exonerated his proposed perpetrator, it also incriminated Davi. Now he wishes the new DNA evidence would go away.

[¶ 20.] This Court set the standard for post-conviction DNA analysis in *Jenner v. Dooley*, 1999 SD 20, 590 N.W.2d 463. First, the results must meet the *Daubert* test for scientific reliability. Second, the defendant must show the defendant would be entitled to the testing and the results would be admissible if the case were being presently tried. Third, the defendant must show that a favorable test result would most likely produce an acquittal in a new trial. Fourth, testing should not be

allowed if it imposes an unreasonable burden on the State.

[¶ 21.] Although *Jenner* was decided after we remanded this case for new DNA testing, Davi's request met the four *Jenner* tests. First, the new DNA test results meet the initial part of the *Daubert* standard set forth in *Daubert v. Merrell Dow*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *State v. Moeller*, 1996 SD 60, 548 N.W.2d 465, this Court said PCR DNA testing is a reliable method of forensic identification. Dr. Edward T. Blake who did the PCR DNA testing here is the same expert approved by this Court in the *Moeller* case. Statistical probability analysis evidence based on DNA results has also been approved. *State v. Schweitzer*, 533 N.W.2d 156 (S.D.1995). The requested new DNA testing also meets the second part of the *Daubert* test because the results are relevant to the task at hand. In *State v. Edelman*, 1999 SD 52, 593 N.W.2d 419, we noted that DNA test results are scientific knowledge that can clearly assist the trier of fact. Second, Davi would be entitled to the testing, and the results would be admissible, if the case were presently being tried. Third, a favorable test excluding Davi would most likely produce an acquittal in a new trial. On direct appeal, this Court noted the importance of the semen stain which was tested as the physical evidence that tied Davi to the murder. *Davi*, 504 N.W.2d at 856. Fourth, testing did not impose an unreasonable burden on the State.

[¶ 22.] There are several reasons for admitting this new DNA evidence at the habeas corpus proceeding.

[¶ 23.] The results of DNA testing reconcile two competing goals of a post-conviction review. The first goal is to prevent the conviction of an innocent person. The second goal is the finality of judgments. Admitting DNA evidence meets both goals. If the evidence exonerates the defendant, then the goal of not allowing an innocent person to stand convicted is served. If the evidence incriminates the defendant, then the goal of finality of judgments is met by adding certainty to the result.

[¶ 24.] In *Jenner*, this Court noted that post-conviction DNA testing is most suitable when (a) identity of a single perpetrator is at issue; (b) evidence against the defendant is so weak as to suggest real doubt of guilt; (c) the scientific evidence, if any, used to obtain the conviction has been impugned; and, (d) the nature of the biological evidence makes testing results on the issue of identity virtually dispositive. *Jenner*, 1999 SD 20 at ¶ 20, 590 N.W.2d at 472. Applying this test in reverse, (a) this is a single perpetrator case; (b) the new DNA evidence against Davi is so strong as to suggest no real doubt of guilt; (c) the new DNA results do not impugn the scientific evidence used to convict Davi at his trial; and (d) the nature of the new DNA evidence is virtually dispositive of identity. Therefore, post-conviction DNA test results should be admissible against Davi as well as for him.

[¶ 25.] DNA testing is an equal benefit. In *Edelman*, 1999 SD 52 at ¶ 32, 593 N.W.2d at 425, this Court observed "Furthermore, as in *Moeller*, the benefits of PCR testing extend *to both the State and Edelman*." (emphasis added). Equal benefit to the prosecution and the defense has been considered important in determining whether scientific evidence should be admitted in criminal cases. *State v. Loftus*, 1997 SD 131, 573 N.W.2d 167. DNA testing has also been considered in civil, paternity and estate cases. In *C.W.*, 1997 SD 57, 562 N.W.2d 903, DNA testing established paternity in an abuse and neglect case. In D*ept. of Social Services v. McCarty*, 506 N.W.2d 144 (S.D.1993), DNA testing was admitted as evidence of paternity under SDCL 25–8–7.1. *In Matter of Erbe*, 457 N.W.2d 867 (S.D.1990), the dissenting justice discussed the feasibility of establishing the paternity of a pretermitted heir. If the benefits of DNA evidence extend to both sides in other trials, they

should also extend to both sides in a post-conviction proceeding.

▆▆▆▆▆ [¶ 26.] The State has no burden of proof at a habeas corpus proceeding, only the burden of meeting the evidence of the petitioner, who has the burden of proof. *Siers v. Class*, 1998 SD 77, 581 N.W.2d 491. If unfavorable DNA results are admissible against a defendant in a criminal trial where the burden of proof is on the State to prove guilt beyond a reasonable doubt, *State v. Smith*, 1999 SD 83, 599 N.W.2d 344, then they should also be admissible in a habeas corpus proceeding where the burden of proof is on the petitioner to prove by a preponderance of the evidence that he is entitled to relief. *Siers*, 1998 SD 77 at ¶ 10, 581 N.W.2d at 494.

[¶ 27.] Davi eagerly sought to use the DNA tests before the results were received; he must now live with the results whether incriminating or exonerating. The habeas corpus court did not abuse its discretion in admitting this new DNA evidence.

ISSUE TWO

SEROLOGY EXPERT

▆▆▆▆ [¶ 28.] At trial, the State offered the testimony of Rex Riis, the in-house scientific expert for the South Dakota Division of Criminal Investigation. Riis testified that a semen stain found on Diane Davi's leg could have been deposited by any of twenty percent of the male population. Davi was included in the twenty percent. On direct appeal of his conviction, this Court noted that the semen stain was physical evidence that tied Davi to the murder. *Davi*, 504 N.W.2d at 856. Similarly, the habeas corpus trial court acknowledged that the semen stain was the one piece of physical evidence linking Davi to the murder.

[¶ 29.] Davi's trial counsel did not hire a serology expert. Attorney Cahill consulted briefly by telephone with a serologist with the Minnesota Bureau of Criminal Apprehension and then took it upon himself to deal with the serological evidence. Counsel brought out that Dale Callies, who was Diane Davi's ex-husband and a proposed third party perpetrator, was also included in the twenty percent.

[¶ 30.] At the habeas trial, Davi presented a serologist who testified that he could get the twenty percent number up to thirty-seven percent. The higher number of possible male donors would decrease the likelihood that Davi left the semen stain on Diane's leg. Nevertheless, Davi would still be in the thirty-seven percent and so would Diane's ex-husband, Dale Callies.

▆▆▆▆ [¶ 31.] The decision to call (or not to call) an expert is a matter of trial strategy. *Garritsen v. Leapley*, 541 N.W.2d 89 (S.D.1995). However, the habeas court found that trial counsel made a serious error in not calling a serological expert. The habeas court determined that the error was not just a matter of trial strategy and that Davi had met the first part of the two-part *Strickland* test. However, the habeas court also found that Davi was not prejudiced by the error because the increase from twenty percent to thirty-seven percent was not enough to change the result of the trial.

[¶ 32.] We disagree with the habeas court's findings and conclusions. Davi's retained counsel were well-qualified and capable of making a sound strategic decision to not call a serological expert. The best an expert could have done was raise the State's figure from twenty percent to thirty-seven percent.[1] Davi would still

---

1. Davi's habeas counsel argues that a defense expert could also have testified that Davi was excluded from the sample of fluids taken from Diane's vagina after she was found dead. However, the tests by the new defense expert did not exclude Davi, the tests just did not include him. (Failure to include him may have resulted from the bottle of Summer's Eve douche that was found in Diane's vagina which probably obliterated traces of Davi in her vaginal fluids.) Failure to include him does not exclude him.

have been included. The downside is that a defense serologist would have *confirmed* the State's evidence that Davi was a possible contributor of the semen in the stain. Davi's defense was an alibi. If the defense had called an expert, there would have been two experts saying Davi could have been there instead of one.

[¶ 33.] The State, however, has failed to preserve this question for review. The State did not propose a finding that trial counsel did not err in failing to hire and use a serological expert and the State did not file a notice of review.

[¶ 34.] We do agree with the habeas court's finding that failure to hire and use a serological expert was not prejudicial. Whether the number would have been twenty percent or thirty-seven percent, it still included Davi and Callies. Davi's attorneys proposed Callies to the jury as a third party perpetrator. Davi's alibi defense would not have changed. Davi was either somewhere else or he was not, and, unfortunately for him, there was a wealth of circumstantial evidence that he, and not Callies, murdered Diane.[2]

## ISSUE THREE

## THIRD PARTY PERPETRATOR

[¶ 35.] As noted earlier, Davi advanced Dale Callies, Diane Davi's previous ex-husband, as a third party perpetrator. At trial, Davi's counsel argued that three things pointed to Callies as a perpetrator: (1) he was previously married to Diane, (2) he was included in the twenty percent of the male population that could have left the semen stain found on Diane's leg, and (3) he had no alibi. Obviously, the jury did not believe Callies was the murderer. Davi claims his trial counsel were ineffec-

tive for not developing additional information that could have convinced the jury that Callies murdered Diane.

[¶ 36.] Before evidence of a third party perpetrator defense can be introduced, the trial judge must determine that the evidence is more probative than prejudicial to the State. The three factors to be considered are (1) proximity, (2) motive and (3) opportunity. *State v. Larson*, 512 N.W.2d 732, 739 (S.D.1994). At the outset, we note that the trial court did not prevent Davi from advancing Callies as a third-party-perpetrator Davi's counsel were permitted to argue to the jury that Callies did not have an alibi and was included in the twenty percent of the male population that could have left the semen stain on Diane's leg.

[¶ 37.] The first thing Davi claims trial counsel missed was a domestic protection order that Diane obtained in 1984, while she was still married to Callies, six years before she was killed. In her affidavit for the protection order, Diane alleged that Callies had assaulted her on several occasions and whenever they argued about accusations, Callies would start choking her, slapping her, or hitting her head. Prior to trial, the State disclosed Callies' rap sheet showing that he was charged with violating the protection order. Davi argues that his counsel should have investigated the charge and found the protection order and the "choking" claim in Diane's affidavit. Davi claims this would have incriminated Callies because Diane was strangled to death. In addition, Davi claims counsel should have discovered that Callies had threatened to kill Diane on September 23, 1984, and had shot a gun to prove it was loaded.

---

2. In addition to the facts already noted, shortly before the murder, Davi said he "had purchased a cross-bow and that it had 170 pounds of pressure and that he was going to shoot [Diane] between the eyes with it." Davi also said "he knew a hit man out of Sioux City that could or would kill Diane for money." Davi also admitted at trial that he contacted Diane's ex-husband, Dale Callies, about obtaining custody of Callies and Diane's son, Chad, just to hurt Diane. As this Court said in *Davi*, 504 N.W.2d at 857, "There was an abundance of circumstantial evidence which, if believed by the jury, would sustain the convictions of Davi."

[¶ 38.] There are two problems with this information. First, it was six years old at the time of Diane's murder. After their divorce, Diane and Callies had an uneventful relationship with no problems and no violence. The habeas court found that the protection order evidence was too remote and this finding is not clearly erroneous. Second, we do not know if the trial judge would have let the information into evidence. There are hearsay problems and remoteness of prior bad act problems. The question is not whether we would admit the evidence but whether the trial judge would have admitted it. In order to amount to ineffective assistance of counsel, we would have to speculate that the trial judge would have allowed the evidence and that it would have made a difference. We will not so speculate.

[¶ 39.] Secondly, Davi claims trial counsel missed a child support arrearage Dale Callies owed the State of South Dakota for Chad Callies, the child he fathered with Diane Davi. Davi believes this would have provided a motive for Callies to murder Diane. We disagree. No extraordinary collection efforts were underway at the time Diane was killed. It is far-fetched to believe that Callies killed her to avoid paying $3,326 in back child support that he would still have to pay to the State.

[¶ 40.] Thirdly, Davi claims trial counsel missed a guardianship petition that Callies filed one week after Diane's death. On behalf of his son, Callies collected a $40,000 life insurance policy on Diane. Later, after Davi's trial, he embezzled $10,000 from the guardianship. Davi claims this establishes a motive for Callies to murder Diane. Again, we disagree. The insurance policy was carried by Diane's employer and there is no evidence that Callies or anyone, including Diane, knew the policy existed. The beneficiary was Chad Callies, not Dale Callies. There is nothing sinister in a non-custodial father becoming his son's guardian after the custodial mother's death. Non-custodial fathers do not automatically receive custody upon the death of custodial mothers and parents are not their children's guardians in any event. In order to care for a child's money and property, a parent must get authority from a court by becoming the child's guardian.[3]

[¶ 41.] The habeas court found that trial counsels' performance was not deficient. We agree.

## ISSUE FOUR

### "AND OTHERS"

[¶ 42.] In her application for a protection order against Davi, Diane alleged that he had burglarized her apartment "and others." The trial judge granted a pretrial defense motion to strike the words "and others." Defense counsel failed to take the offending words out before the exhibit went to the jury. The words "and others" were not discussed during the trial or argued to the jury in closing. The habeas court found that failure to delete "and others" was error but was not serious enough to violate the Sixth Amendment. We agree. The right to effective assistance of counsel does not mean that a lawyer cannot make a mistake. To meet the first part of the *Strickland* test, counsel's performance must be so deficient that the lawyer was not functioning as "counsel" guaranteed by the Sixth Amendment. *Mitchell v. Class*, 524 N.W.2d 860, 862 (S.D.1994). There were more than sixty witnesses and nearly one hundred exhibits in Davi's jury trial. There is no indication that trial counsels' oversight in failing to redact "and others" was in any way prejudicial.

## ISSUE FIVE

### PROZAC

[¶ 43.] Davi's parole officer testified that Davi took Prozac. Davi now

---

**3.** "The parent, as such, has no control over the property of the child." SDCL 25-5-6. A person appointed to manage a minor's estate or financial affairs is now called a "conservator." 29A-5-102(2) A parent may be a child's conservator. SDCL 29A-5-110.

contends that his trial counsel were ineffective for failing to object because there were a spate of articles at the time of his trial about the side effects of Prozac turning people into crazed killers. The defense team discussed whether to object to testimony about Prozac and decided not to attempt to keep it from the jury. Davi agreed at the time. The habeas court found that the decision not to object to testimony about Prozac was trial strategy. We agree.

[¶ 44.] In *Fast Horse*, 521 N.W.2d at 106, we said that differences of trial tactics do not amount to ineffective assistance of counsel. A petitioner "must show more than that the trial strategy of the defense counsel backfired or that another attorney would have prepared and tried the case in a different manner." *Aliberti*, 428 N.W.2d at 640. "This Court will not second-guess the strategic decisions of trial attorneys." *Fast Horse*, 521 N.W.2d at 106.

## ISSUE SIX

### WITNESS IMPEACHMENT

[¶ 45.] Davi faults his trial counsel for failing to impeach various witnesses. Several witnesses had misdemeanor arrests or convictions. Dale Callies had a 1976 burglary charge that was dismissed and a 1976 suspended imposition of sentence neither of which were admissible for impeachment. He also had a suspended imposition for a 1984 protection order violation and two shoplifting convictions. None of these were admissible either.

[¶ 46.] Davi also complains that activity in Callies' child support collection file should have been used to impeach Callies' trial testimony that the State had not tried to enforce his child support obligation for several years. At the habeas trial, a witness called by Davi testified that there had been activity in Callies child support file. However, there was no evidence that Callies knew about the activity. Callies also testified at trial that he had not had much contact with his son, but stated in the guardianship filed after Diane's death that he had a close relationship. Davi claims this should have been used to impeach Callies. However, it is possible to have a close relationship with your child without seeing the child much. At best, this is impeachment on a peripheral matter. Both items are minor and would not have made any difference in the outcome of the case.

[¶ 47.] Finally, Diane's father testified at trial that he did not tell a police officer that he had driven by Diane's apartment at 12 noon on the day of the murder. Davi claims his lawyer should have called the officer to testify that Diane's father told him he drove by at noon and again at 12:30 p.m. Having laid this foundation of inconsistent statement, Davi claims his lawyer should have argued that Davi was not there because Diane's father had driven by her house at 12 to 12:30 p.m., which was the time of the murder. He rationalizes that since her father did not see Davi's car, he must not have been there. This attenuated argument fails because a prior inconsistent statement is not evidence of what is contained in the statement; it is only admissible for impeachment. *State v. Andrews*, 393 N.W.2d 76 (S.D.1986). Therefore, Davi could not have used the prior inconsistent statement as the basis for an evidentiary inference.

[¶ 48.] At best, none of the impeachment was significant. Impeachment on minor matters is a matter of trial strategy. *Jenner v. Class*, 79 F.3d 736 (8th Cir.1996); *Olesen v. Lee*, 524 N.W.2d 616 (S.D.1994). The habeas court found that trial counsels' performance was not deficient. We agree.

## ISSUES SEVEN AND EIGHT

### STATEMENTS TO PAROLE OFFICER

and

### "INADMISSIBLE EVIDENCE"

[¶ 49.] Parole Officer Holloway talked to Davi while he was in jail awaiting

trial. Defense counsel did not tell Davi not to talk to Holloway. Local counsel complained and the prosecutor agreed not to use any statements made by Davi to the parole officer. The agreement was not in writing. At trial, Davi was cross examined by the prosecutor about lying to this parole officer. Trial counsel did not object until the next day. Davi claims ineffective assistance of counsel for allowing him to talk to the parole officer and for failing to make a timely objection to cross examination about what he said to the parole officer. Several witnesses also testified without objection from the defense that Diane was afraid of Davi. Davi claims that the failure to object was ineffective assistance of counsel.

[¶ 50.] This Court considered these issues on direct appeal. As to the statements to the parole officer, this Court said "We are unable to say that any acts of the prosecutor resulted in prejudice so harmful as to have an effect upon the jury's verdict or Davi's rights." *Davi*, 504 N.W.2d at 856. As to the witnesses who testified that Diane was afraid of Davi, this Court said "although it was error for the trial court to admit the hearsay statements regarding Diane's fear of Davi for the purposes of identity, the error was harmless as the evidence was cumulative of other evidence presented independently at trial." *Davi*, 504 N.W.2d at 855. Davi now raises the same questions framed as ineffective assistance of counsel. The habeas court held that the direct appeal was res judicata on both issues. We agree. These issues will not be reconsidered because res judicata bars reexamination of issues substantially raised on direct appeal. *Sprik*, 1997 SD 134 at ¶ 20, 572 N.W.2d at 828; *Lodermeier v. Class*, 1996 SD 134, 555 N.W.2d 618; *Miller v. Leapley*, 472 N.W.2d 517 (S.D.1991).

## CONCLUSION

[¶ 51.] Strategic decisions are best left up to counsel. A defendant is entitled to a fair trial, not a perfect one.

*Black*, 1997 SD 22 at ¶ 24, 560 N.W.2d at 550; *State v. Raymond*, 540 N.W.2d 407 (S.D.1995). Davi had a fair trial. A defendant is entitled to competent lawyers, not perfect ones. *State v. Wika*, 464 N.W.2d 630 (S.D.1991). Davi hired competent counsel and got what he bargained for—highly qualified, excellent lawyers who did a fine job. Even the best can make mistakes. The test is whether the errors are so serious that we question whether the result of the trial is reliable, *Lykken*, 1997 SD 29 at ¶ 27, 561 N.W.2d at 308, *Woods v. Solem*, 405 N.W.2d 59, 61 (S.D.1987) and whether we have confidence in the outcome. *Black*, 1997 SD 22 at ¶ 18, 560 N.W.2d at 549. In this case it appears the result was reliable and that Davi was guilty. Davi has not shown otherwise. The habeas court is affirmed.

[¶ 52.] MILLER, Chief Justice, and SABERS, KONENKAMP and GILBERTSON, Justices, concur.

[¶ 53.] GORS, Circuit Judge, for AMUNDSON, Justice, disqualified.